# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

BETTY GRBA-CRAGHEAD,     )
                         )
     Plaintiff,       )
                         )
V.                      )     Case No. 4:08CV1894 RWS/MLM
                         )
MICHAEL J. ASTRUE,      )
Commissioner of Social Security   )
                         )
     Defendant.      )

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

This is an action under Title 42 U.S.C. § 405 (g) for judicial review of the final decision of Michael J. Astrue ("Defendant") denying the application of Betty Grba-Craghead ("Plaintiff") for Disability Insurance Benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401. Plaintiff has filed a brief in support of the Complaint. Doc. 7. Defendant has filed a brief in support of the Answer. Doc. 9. The cause was referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to Title 28 U.S.C. § 636(b)(1). Doc. 2.

## I.
## PROCEDURAL HISTORY

Plaintiff filed her application for Social Security disability benefits on May 15, 2006, alleging a disability onset date of April 10, 2001.[1] Tr. 87. Plaintiff's application was denied and Plaintiff

---

[1]     Plaintiff's May 15, 2006 application for benefits is the fourth application she has filed. Her third application was denied by the Appeals Council. As stated by the Administrative Law Judge ("ALJ"), April 8, 2004, the date of the decision denying benefits based on Plaintiff's third application is, therefore, the earliest onset date which Plaintiff can have. Tr. 29. Plaintiff's Title II insured status expired on December 31, 2005. Plaintiff, therefore, must prove that she became disabled between April 8, 2004, and the date her insured status expired, December 31, 2005. See 20 C.F.R. § 404.130; Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).

requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 62. On November 19, 2007 a hearing was held before an ALJ. On December 13, 2007, the ALJ issued a decision finding that Plaintiff was not disabled through the date of the decision. Tr. 12-23. Plaintiff filed a request for review with the Appeals Council, which denied Plaintiff's request on October 20, 2008. Tr. 1-4. As such, the ALJ's decision is the final decision of the Commissioner.

## II.
## MEDICAL RECORDS:

A Psychology Report completed by Dorothy Spencer, M.A., dated December 15, 1994, states that Plaintiff applied to the DVR to investigate the possibility of her having attention deficit disorder ("ADD") and to explore career potentials; that Plaintiff was given the Wechsler Adult Intelligence Scale, which showed Plaintiff had a full scale IQ of 95, placing her within the range of average intellectual functioning; that Plaintiff was administered the Bender Visual Motor Gestalt Test ("Gestalt Test"), on which Plaintiff completed tasks "within average time limits for this measure"; that the Gestalt test showed that Plaintiff had "problems with psychomotor control, with size discrepancies"; that on the Woodcock Johnson Psychoeducational Battery Plaintiff's responses, according to her age, put her at a fifty-four percentile for reading, eleven percentile for mathematics, and twenty percentile for written language; that on a Rorschach Test Plaintiff showed a "mental/perceptual approach to new or ambiguous situations in which she is capable of analysis of components of the situation in order to arrive at overall meaning"; that the Rorschach Test showed that Plaintiff had the intellectual capacity to achieve her intellectual ambitions," "can see the obvious in common with most people," "has a practical streak" and a "highly creative, inventive manner of approach in situations where she feels comfortable"; and that Ms. Spencer's diagnosis was that

Plaintiff had a learning disorder in mathematics. Ms. Spencer further reported that at Axis I, Plaintiff had Attention Deficit Hyperactivity Disorder ("ADHD"), residuals, predominately inattentive type, mild to moderate; post-traumatic stress disorder ("PTSD"), in partial remission due to recent therapeutic counseling; depressive disorder, in partial remission under treatment; and mathematics disorder, severe. At Axis II, Ms. Spencer noted that Plaintiff reported a injured hip. At Axis IV, Ms. Spencer reported that Plaintiff had problems with her primary support group, including a history of physical and sexual abuse; that Plaintiff had occupational problems, including health enforced vocational change; and that Plaintiff had economic problems related to her divorce, loss of house and need for occupational change. At Axis V, Ms. Spencer found that Plaintiff had a GAF of 61. Tr. 293-98.

A Missouri Vocational Rehabilitation Psychological Consultant Worksheet, dated January 14, 1995, completed by J. R. Koller, Ph.D., states that Plaintiff had SLD, ADHD, depression, and PTSD; that Plaintiff had functional limitations with regard to sustained attention and written expression; and that Plaintiff had a history of and treatment for depression and PTSD. Tr. 291.

A Missouri Vocational Rehabilitation Psychiatric Evaluation, dated May 5, 1998, states that Plaintiff was a 45 year old female; that Plaintiff had "a long history of depression"; that Plaintiff had "symptoms of loss of interest, fatigue, decreased concentration, feelings of hopelessness; that Plaintiff had a history of ADD and was prescribed Cylert with "good results"; that Plaintiff was given Paxil "but developed side effects"; that Plaintiff was "on Wellbutrin and [wa]s doing well"; that Plaintiff's mental status was "that of a middle aged, white female who [was] alert and cooperative," with normal "flow of thought," depressed affect, and intact memory; that Plaintiff's insight and judgment were good; that the impression was "major depression, unipolar" and a history of ADD; and that Plaintiff's

treatment plan should include Wellbutrin, Cylert, and a check of liver enzymes. Tr. 292.

A progress note from Tri-County Pulmonary Medicine dated January 25, 2000, states that Plaintiff presented with complaints of fumes in her work area which triggered her asthma; that Plaintiff believed if she worked only four days per week she would "feel better"; that Plaintiff had a history of asthma at work; and that her chest "becomes tight" and she coughs. Tr. 232.

A progress note from Tri-County Pulmonary Medicine, dated October 17, 2000, states that Plaintiff presented with complaints of asthma attacks, coughing up liquids, and not "feeling good"; that Plaintiff discussed workers' compensation; that Plaintiff was exposed multiple times to "fumes at work"; and that Plaintiff was given a sample of Flonase. Tr. 231.

A progress note from Tri-County Pulmonary Medicine, dated October 20, 2000, states that Plaintiff presented with tachycardia; that her "plan" included "Xopenex 1.25"; that her "peak flow pre" was 400; and that her "peak flow post" was 400. Tr. 228.

A progress note from Tri-County Pulmonary Medicine, dated November 20, 2000, states that Plaintiff was given a pulmonary stress test, and that Plaintiff reported that she felt "much better. Tr. 229.

Records from Northland Mid-America Orthopedics, dated April 10, 2001, state that Plaintiff was examined for new pain in her left elbow and that Plaintiff had asthma. Tr. 378.

Records from Northland Mid-America Orthopedics, dated May 1, 2001, state that Plaintiff was seen for a recheck examination; that Plaintiff's examination "revealed good healing of her tenosynovitis"; that "no neurological or tendon deficit" was seen; that Plaintiff had "excellent range of motion of her elbow with full extension"; and that Plaintiff was given "Indocin SR one b.i.d. for her tenosynovitis." Tr. 378.

Records from Northland Mid-America Orthopedics, dated May 1, 2001, state that Plaintiff "didn't want to take Indocin." Tr. 378.

Records from Northland Mid-America Orthopedics, dated May 22, 2001, state that a "recheck examination" of Plaintiff "revealed good healing of her tenosynovitis"; that there was "no neurologic or tendon deficit"; and that Plaintiff was "instructed to return to the office in one month." Tr. 379.

Records from Northland Mid-America Orthopedics, dated June 19, 2001, state that Plaintiff had "an increase in the amount of her triceps tendinitis" and that Plaintiff was "given a Medrol Dose Pak" and asked "to return to the office in one week." Tr. 379.

A progress note from Tri-County Pulmonary Medicine, dated September 20, 2001, states that Plaintiff presented to have her medication monitored; that she had no exercise routine "but [was] very active"; that her "sinus and breathing [were] about the same"; that she "ha[d] disability papers" and "ha[d] not worked since 10/00"; that she was exposed to diesel fumes and ozone at work; that her chest was clear; and that she was switched to Claritin D and Advair. Tr. 227.

Records from Northland Mid-America Orthopedics, dated February 13, 2003, state that Plaintiff was seen for evaluation of problems with both knees and both elbows; that Plaintiff denied any previous injury; that Plaintiff had "crepitation of the patella" when trying to squat; that Plaintiff had no specific tenderness of the patella or instability in either knee; that Plaintiff had no swelling or effusion; that Plaintiff had tenderness in the joints of her elbows; that Plaintiff's x-rays showed no significant bone abnormalities; that Plaintiff's x-rays showed well-maintained joint spaces; that there was "mild tilting of the patella present" and that "otherwise, the x-rays [were] unremarkable"; that Plaintiff had "synovitis of bilateral elbows as well as lateral epicondylitis on the right"; that she had

"patellofemoral arthralgia of bilateral knees"; and that Plaintiff was given samples of Bextra, placed in a Tubigrip, and given a tennis elbow strap. Tr. 375.

Records from Northland Mid-America Orthopedics, dated April 10, 2003, state that Plaintiff was seen "for re-check of the problems with her elbows and knees" and "[was] making some progress"; that it was recommended that Plaintiff use a tennis elbow brace and a patella stabilizing brace for her left knee; and that Plaintiff should return in one month. Tr. 374.

John Canale, M.D., reported on May 8, 2003, that Plaintiff "ha[d] a long history of depression." Tr. 221.

A progress note from Tri-County Pulmonary Medicine, dated May 15, 2003, states that Plaintiff presented with concerns about Advair and that Plaintiff reported that her MDI's were "not working" and were making her "heart race"; that her asthma "never feels good"; that she wheezed and experienced shortness of breath; that she used Albuterol twice daily; and that she used Flonase and Allegra to treat her sinus problems. Tr. 225.

A note from Northland Mid-America Orthopedics, dated May 19, 2003, states that Plaintiff was seen "for a recheck of the problem with her right elbow"; that Plaintiff was "still having some problems and also having problems with the left as well"; that Plaintiff had tenderness over the lateral epicondylar region of her elbow; and that Plaintiff was to be placed in a tennis elbow brace for her left arm. Tr. 374.

A progress record from Tri-County Pulmonary Medicine, dated June 1, 2003, states that Plaintiff had "bad memory" and could not "recall a lot of things." Tr. 280.

In a Health Assessment Questionnaire from Missouri Vocational Rehabilitation, dated June 3, 2003, Plaintiff stated that she had asthma and depression; that she was withdrawn; that her asthma

medication caused memory loss and hand trembling; that she was then currently being treated for major depression and asthma; that her medications were Advair, Proventil, Singulair, Wellbutrin, Allegra D, Flonase, Nexium, and Combuvent; that during the two prior years she had received ears/nose/throat, respiratory, cardiovascular, internal, orthopedic, and psychiatric treatment; and that she had mitral valve prolapse, acid reflux, torn meniscus, and major depression. Tr. 305-06.

Records from Northland Mid-America Orthopedics, dated June 5, 2003, state that Plaintiff reported that "the problem with her right elbow" was improved; that Plaintiff had injured her toe and was "complaining of swelling, ecchymosis, and pain [in] the fourth toe of the right foot"; that Plaintiff was tender above her toe joints; that x-rays did not show a fracture in Plaintiff's toe; that Plaintiff had a "contusion of the 4th toe of the right foot"; and that Plaintiff was released to "wean herself off her shoe" and would not need to return "as long as she continue[d] to improve." Tr. 373.

Counselor Lydia Mitchell, of Missouri Vocational Rehabilitation, stated in a document titled Eligibility Certification, dated June 17, 2003, that Plaintiff had primary cognitive impairments involving learning, thinking, processing information, and concentration due to her specific learning disabilities; that Plaintiff had a secondary cognitive impairment due to her ADHD; that Plaintiff had major depression; that Plaintiff had PTSD; that Plaintiff had functional limitations with regard to math, writing, attention, and concentration; that Plaintiff reported asthma and sensitivity to "certain environments"; that Plaintiff's impairment resulted in a substantial impediment to employment in that Plaintiff "must avoid employment likely to aggravate disability" and "must avoid employment likely to create a hazard to future health and safety"; and that Plaintiff's "disability interferes with preparation for an occupation commensurate with capabilities and abilities." Tr. 285.

A report titled "Significantly Disabled Classification, dated June 17, 2003, states that Plaintiff

was significantly disabled; that Plaintiff's vocational rehabilitation could require multiple services over an extended period; that Plaintiff required "assistance on an ongoing basis to begin tasks, monitor her own behavior, [and] make decisions"; that Plaintiff had "limitations in physical or mental capacity or endurance that will likely require training… assistive technology not typically made for other workers, or [wa]s significantly restricted in daily, weekly, or yearly work periods of most employment"; and that Plaintiff suffered from Major Depression Recurrent. Tr. 288-89.

Records from Northland Mid-America Orthopedics, dated June 19, 2003, state that Plaintiff was seen "for a recheck of the problem with her right elbow"; that Plaintiff was "still having some problems and she [was] also having problems on the left"; that Plaintiff had tenderness over the lateral region of her elbow; and that physical therapy and continued anti-inflammatory medication were recommended. Tr. 374.

A Diagnostic Imaging report from St. Joseph Hospital West, dated June 27, 2003, states that Plaintiff's bone mineral density was assessed; that Plaintiff's density corresponded to a T-score within the standard deviation below the mean for young normal females; that Plaintiff's density corresponded to a Z-score within the standard deviation below the mean for age-matched females; and that the impression was that Plaintiff had osteopenia in the lumbar spine area with a moderate risk for osteoporotic fractures compared to normal females. Tr. 395.

A spirometry report from Tri-County Pulmonary Medicine, completed by Stephen B. Lillard, M.D., F.C.C.P., dated July 14, 2003, states that Plaintiff showed reduced FVC, FEV1, a restrictive defect; that Plaintiff showed a significant response to bronchodilator in the large and small airways, consistent with an obstructive defect; that Plaintiff's TLC was mildly increased "suggesting a moderate degree of hyperinflation and the RV [wa]s moderately increased suggesting a moderate

degree of air trapping"; that Plaintiff's airway resistance was mildly increased; and that Plaintiff's diffusion/capacity was "supernormal when corrected for alveolar volume." Tr. 277.

Notes from Northland Mid-America Orthopedics, dated July 28, 2003, state that Plaintiff was "contacted in regard to the results of her bone density evaluation"; that Plaintiff's lumbar spine study was "consistent with osteopenia"; that Plaintiff was advised to take a calcium supplement; and that if Plaintiff's bone density was still low after supplementing for three months, "she would be a candidate for Fosamax." Tr. 373.

A progress record from Pulmonary Consultants, Incorporated, dated March 25, 2004, states that a portable nebulizer was ordered for Plaintiff. Tr. 274.

Michele Wood, M.D., reported on March 25, 2004, that Plaintiff had experienced staring spells, blurring episodes, and squinting. Tr. 257.

An April 2, 2004 admission record from St. Joseph Hospital West, completed by Dr. Wood, states that Plaintiff was admitted for a "visual disturbance." Tr. 254.

An April 1, 2004 electroencephalograph report from St. Joseph Hospital West, completed by F. Simowitz, M.D, states that Plaintiff had an EEG; that the EEG showed no focal, paroxysmal, or seizure activity; and that the EEG was within the range of normal limits. Tr. 258.

A letter to Dr. Lillard from Dr. Wood, dated April 15, 2004, states that Dr. Wood had seen Plaintiff for "abnormal movements"; that Plaintiff had experienced "problems with repetitive eye blinking and lip biting for many years"; that Plaintiff had taken Topamax, which helped her symptoms; that Plaintiff was never diagnosed with seizures or tics; that Plaintiff was "shaken fairly severely as a baby, but she did not have permanent sequel from that"; that Plaintiff's past medical history included significant asthma; and that, upon examination, Plaintiff was alert and oriented times 3 with fluent

speech and language, her cranial nerves were intact, her motor strength was 5/5 with normal tone and no drift, her sensation and coordination were intact, her gait was steady, her heart was regular, and no carotid bruits were noted. Tr. 355.

Dr. Blair, of St. Peters Family Medicine, reported on April 22, 2004, that Plaintiff complained of tingling in her hands, light-headedness, chest pain, and tingling in her feet; that Plaintiff had asthma, GERD, MVP, and excessive blinking; and that Plaintiff's medication included Wellbutrin, Proventil, and Advair. Tr. 322.

An April 23, 2004 cardiopulmonary lab stress report from Barnes-Jewish St. Peters Hospital completed by Diana Westerfield, D.O., states that Plaintiff's lungs were clear; that Plaintiff's sinus rhythm was normal; and that the impression was that Plaintiff had "no exercise induced chest discomfort, normal heart rate response to exercise, normal blood pressure response to exercise, normal 02 saturation during stress, no arrhythmia during exercise, [and] no diagnostic EKG change." Dr. Westerfield further reported on this date that a resting EKG showed that Plaintiff had normal sinus rhythm and "nonspecific ST-T changes diffuse"; that Plaintiff had fair exercise tolerance; and that Plaintiff had a negative maximal exercise tolerance test. Dr. Westerfield further reported on April 23, 2004, that Plaintiff's echocardiographic images showed "normal left ventricular systolic function" pre-test and "smaller LV post stress," and that Plaintiff's results were negative for ischemia. Tr. 330-31.

Matt Melander, D.O., of Northland Mid-America Orthopedics, reported on April 29, 2004, that Plaintiff complained of bilateral hand tingling; that "Tinel's testing [was] mildly positive on the left and negative on the right"; that the initial impression was early carpal tunnel syndrome "with the left being worse than the right"; and that Plaintiff was given two wrist splints to wear while sleeping

and a prescription for Naprosyn. Tr. 372

Notes from Northland Mid-America Orthopedics. dated April 29, 2004, state that Plaintiff complained that her "hands [] tingl[ed] on and off" and that these symptoms started on April 19, 2004. Tr. 386.

Dr. Blair of St. Peters Family Medicine reported on May 14, 2004, that Plaintiff complained of constant, traveling pain; that Plaintiff suffered from GERD, asthma, depression, osteoporosis, and carpal tunnel syndrome; and that Plaintiff's medications included Wellbutrin, Advair, and Proventil. Tr. 321.

On a Physician's Order Sheet from Barnes-Jewish St. Peters Hospital, dated May 14, 2004, Dr. Blair stated that Plaintiff was diagnosed with "low back pain." Tr. 328.

A diagnostic imaging record from St. Joseph Hospital West, dated June 1, 2004, states that Plaintiff had a bone density study and that the impression from this study was "mild osteopenia of the lumbar spine and left hip." Tr. 391.

Dr. Blair reported on August 6, 2004, that Plaintiff complained of chest pain, which traveled to her jaw, and dizziness; that Plaintiff suffered from GERD, asthma, MVP, and depression; and that Plaintiff's medications included Advair, Wellbutrin, and Proventil. Tr. 320.

An August 6, 2004 Radiology Consultation Report from Barnes-Jewish St. Peters Hospital, completed by Dr. Blair, states that Plaintiff was examined for chest pain; that the examination "fail[ed] to reveal infiltration, consolidation, pleural effusion, or pneumothorax"; that "the cardiac silhouette [was] normal in size and contour"; that the "aorta and remainder of the mediastinal structures [were] within normal limits, as [was] the pulmonary vascular pattern"; that "the visualized osseous structures [were] intact"; that "a few scattered pulmonary celcifications [were] present,

11

which [were] presumed to be old healed granulomas"; that "no new findings [were] seen"; and that Plaintiff had a "normal chest." Tr. 326.

Records from Northland Mid-America Orthopedics, dated August 12, 2004, state that Plaintiff was evaluated for "injury to her left ankle. She had a twisting type of injury. She complain[ed] of swelling and pain." Records of this date further state that x-rays showed an avulsion fracture of the ligaments in Plaintiff's left ankle and that Plaintiff was placed in a walker boot and shown exercises. Tr. 369.

Records from Northland Mid-America Orthopedics, dated August 26, 2004, state that Plaintiff was seen for re-evaluation of left ankle pain and avulsion fracture; that she had been in the walker boot for two weeks; that Plaintiff reported that she still had "some swelling, but minimal pain" and that her pain had been relieved with Naprosyn; that Plaintiff had tenderness to palpation; that Plaintiff had no gross swelling or ecchymosis swelling; that x-rays showed remnants of the avulsion fracture; and that Plaintiff was instructed to continue exercising her ankle. Tr. 369.

Records from Northland Mid-America Orthopedics, dated September 20, 2004, state that Plaintiff was seen for "a recheck of the left ankle"; that Plaintiff was to be weaned off her "walker boot," using a lace-up brace; and that Plaintiff was shown exercises for strengthening her ankle. Tr. 368.

A record from Northland Mid-America Orthopedics, dated October 12, 2004, states that Plaintiff was seen for a "recheck of the left ankle"; that Plaintiff was "minimally tender over the distal fibula… [and had] good stability"; that Plaintiff was shown some exercises for her calves; that "the pain should be resolving"; and that "as long as [Plaintiff] improved, she [would] not need to return." Tr. 368.

Records from Northland Mid-America Orthopedics, dated January 11, 2005, state that Plaintiff was seen "for a recheck of the left foot and elbow problems"; that Plaintiff's left elbow showed lateral epicondylar symptoms; that Plaintiff reported pain in her left foot; that in the examiner's opinion, Plaintiff was "off loading the lateral portion of [her] foot to protect it" and "that is why she [was] getting the plantar fascial symptoms"; and that Plaintiff was given arch supporters for her feet and advised to continue taking Mobic. Tr. 368.

Records from Northland Mid-America Orthopedics, dated February 1, 2005, state that Plaintiff returned "for a recheck of the problem with her elbow and her foot"; that Plaintiff was "having trouble with some ambulation"; that, "overall," Plaintiff seemed "improved"; that Plaintiff was "not having any further problems with her elbow"; that the problem with Plaintiff's left foot, "mostly the plantar fasciitis, [would] resolve"; and that Plaintiff was released from treatment on that date. Tr. 367.

Records from Northland Mid-America Orthopedic, dated March 3, 2005, state that Plaintiff was "still having problems with her foot and elbow" and was "complaining mostly of the elbow"; that Plaintiff requested injections; that the examiner recommended that she take Ibuprofen for foot pain; that Plaintiff had "tenderness over the lateral epicondylar region"; and that Plaintiff's lateral epicondylar region was injected with Marcaine and Depo-Medrol. Tr. 367.

Dr. Blair's notes of March 23, 2005, state that Plaintiff reported that she had twitching under her eye, elevated blood pressure, and occasionally experienced dyspnea and a rapid heart beat; that Plaintiff had asthma, GERD, MVP, and depression; and that it was recommended that Plaintiff see "her eye doctor" for her eye twitch. Tr. 318.

Dr. Blair's notes of April 20, 2005, state that Plaintiff requested medication for her anxiety

and that Plaintiff described having stress "every day." Tr. 317.

Dr. Blair's notes, dated May 6, 2005, state that Plaintiff complained of hot flashes after she stopped taking Wellbutrin. Tr. 317.

Records from Northland Mid-America Orthopedics, dated May 17, 2005, state that Plaintiff presented for a recheck "of the problem with her elbows"; that Plaintiff reported "some right elbow as well as left elbow pain"; that Plaintiff "still [had] the epicondylitis" on her right and left elbows; and that physical therapy was recommended. Tr. 366.

Records from Northland Mid-America Orthopedics, dated June 2, 2005, state that Plaintiff returned "complaining of left elbow pain"; that Plaintiff "[continued] to have tenderness both over the lateral and medial epicondylar region"; and that surgery was recommended for Plaintiff. Tr. 366.

Records from Northland Mid-America Orthopedics, dated August 4, 2005, state that Plaintiff presented for "recheck of the epicondylar release both medial and lateral on her left elbow"; that Plaintiff's incisions were "healing well"; that Plaintiff reported "no significant pain" that day; and that Plaintiff was to be started in physical therapy. Tr. 365.

Records from Northland Mid-America Orthopedics, dated August 25, 2005, state that Plaintiff presented for "recheck of the surgery… on the left elbow"; that Plaintiff's incisions were healing well; that Plaintiff was "getting her motion back"; that Plaintiff still lacked "some full extension"; and that Plaintiff was to continue physical therapy and be seen again in approximately one month for follow-up. Tr. 365.

Records from Northland Mid-America Orthopedics, dated September 8, 2005, state that Plaintiff injured her toe while carrying her dog and that Plaintiff was given Vicodin. Tr. 362.

Records from Northland Mid-America Orthopedics, dated October 27, 2005, state that

Plaintiff presented for follow-up for the surgery to her left elbow; that her incisions were healing well; that there was no significant swelling; that she reported "some pain"; that she had a full range of motion; and that she was not expected to require more visits or therapy if she complied with an exercise routine. Tr. 364.

An unsigned[2] and undated RFC Assessment states that "as of 12/2005," at Axis I, Plaintiff had "Bipolar II D/D"; that at Axis III, Plaintiff had GERDS, motor tics, chronic pain in both elbows; and that at Axis V, Plaintiff had a GAF of 60. The RFC Assessment states that the person completing the RFC Assessment had not conducted any tests; that Plaintiff can manage benefits in her own best interest; that her psychiatric condition does not exacerbate her pain or physical symptoms; that Plaintiff's ability was fair in regard to remembering work-like procedures, understanding and remembering simple instructions, sustaining an ordinary routine without special supervision, making simple work-related decisions, asking simple questions, getting along with co-workers, being aware of normal hazards, interacting appropriately with the general public, maintaining socially appropriate behavior, traveling to unfamiliar places, and using public transportation; that her ability was poor to none in regard to maintaining attention for two-hour segments, sustaining an ordinary routine, performing at a constant pace, responding appropriately to changes in a routine work setting, dealing with normal work stress, understanding and remembering detailed instructions, and carrying out instructions; that, as a result of Plaintiff's mental impairments, she had no restriction of activities of daily living, slight difficulties in maintaining social functioning; and that, as a result of Plaintiff's mental impairments, she often had deficiencies of concentration, persistence or pace and had

_____

[2] Plaintiff states that this RFC Assessment was completed by Dr. Turner, a treating psychiatrist.

"repeated episodes of deterioration or decompenstation in work or work like settings which cause her to withdraw from that situation or to experience exacerbation of signs and symptoms." Tr. 426-28.

James E. Schaberg, M.D., of St. Charles Orthopaedic Surgery, reported on December 28, 2005, that Plaintiff presented for a second opinion regarding her left elbow; that "she had surgery in her left elbow on 7/29/05 by Dr. Farley" for chronic pain; that Plaintiff said she had numbness to the "posterior lateral elbow between the 2 incisions" and that she had no numbness in her elbow prior to the surgery; that Plaintiff said that she had numbness in her hand before the surgery and that it was not improved; that, upon examination, Plaintiff's elbow had a "normal carrying angle, her incisions were "minimally tender," and she had "numbness between the 2 incisions"; that provocative testing for medial epicondylitis was "slightly positive" and testing for lateral epicondylitis was negative; that Plaintiff's hand and finger numbness was increased by elbow flexion tests; that median nerve compression tests increased numbness in Plaintiff's fingers; that Plaintiff had normal strength; that Dr. Schaberg's impression was "possible peripheral nerve entrapment"; that Dr. Schaberg recommended that Plaintiff have a repeat EMG and nerve conduction studies; and that Plaintiff was to forward her medical records for Dr. Schaberg's review. Tr. 235.

Records from St. Charles Orthopaedic Surgery, dated January 1, 2006, state that Plaintiff called to cancel her January 10, 2006 EMG; that Plaintiff said that she did not "see any reason to have test done";  and that Plaintiff wanted to make an appointment with Dr. Schaberg. Tr. 235.

Dr. Schaberg reported on January 23, 2006, that Plaintiff was a 53 year old female "who had both tennis elbow release and golfer's release in July by Dr. Farley"; that those surgeries were for "chronic elbow pain and happened after she was appropriately treated with non-operative treatment";

that, since the surgeries, Plaintiff had "some numbness on the posterolateral aspect of the elbow which [went] down to mid forearm"; that "she also ha[d] some paresthesieas in both medial and ulnar nerve distributions of the hand and she ha[d] some continued tenderness over the medial and lateral condyle regions"; that "physical examination reveal[ed] tenderness to palpation along the medial and lateral aspect of the elbow" and "slightly positive Tinel's over the cubital tunnel"; that there was "no muscle atrophy"; and that "the next step would be getting EMG and nerve conduction studies to rule out significant nerve entrapment." Tr. 235.

An EMG/NCS Report from St. Joseph Hospital West, completed by Fredric M. Simowitz, M.D., dated February 3, 2006, states that Plaintiff's EMG showed normal insertional, resting and action potentials for all muscles tested; that her NCS showed "normal latencies, velocities and amplitudes for all nerve segments tested"; that "exploration of ulnar nerve by 'inching' show[ed] no significant amplitude decay at retrocondylar space or cubital tunnel"; and that Dr. Simowitz's conclusion was "normal EMG and NCS left arm and hand." Tr. 236.

February 3, 2006 admission record from St. Joseph Hospital West, completed by Dr. Schaberg, states that Plaintiff was admitted for pain in her limb. Tr. 249.

Dr. Schaberg reported on February 13, 2006, that Plaintiff was seen "in follow up of her elbow"; that "the nerve conduction studies looked okay"; that Plaintiff was "having some chest pains, some continued paresthesias"; and that Plaintiff was advised "to get back to her primary care physician to have that evaluated." Tr. 234.

Records from Patricia Blair, M.D., dated March 7, 2006, state that Plaintiff said that Tricol made her sick and that Niaspen gave her a rash. Tr. 308.

A progress report from MERS Goodwill completed by Beth Ashmore, dated March 8, 2006,

states that Plaintiff contacted Ms. Ashmore to arrange to complete Plaintiff's evaluation. Tr. 270.

Ms. Ashmore reported, on March 9, 2006, that Plaintiff was "still having pain in her right elbow and that she experienced frequent tingling and numbness but felt that she could return to work. [Plaintiff] was unsure what she would (or could) pursue regarding future work. [Ms. Ashmore] offered [Plaintiff] the Occupational Outlook Handbook website and suggested that she research options and bring a list to her next appointment." Tr. 270.

Ms. Ashmore reported, on March 14, 2006, that Plaintiff was late for an appointment; that Plaintiff reported "constant tingling, numbness and pain in her elbows"; that Plaintiff stated that she "was not able to use her hands/arms for long periods of time and the more she use[d] them, the more they hurt"; that Plaintiff had an appointment with a neurologist scheduled because her orthopedist believed she may have neuropathy; that Ms. Ashmore made suggestions of several lines of work, including "some type of driving (possibly a bus), light assembly, or retail"; that Plaintiff said that "she did not feel that there was anything that she could do without using her arms and hands and that she did not feel comfortable accepting a position that would irritate her disability"; that Plaintiff asked for Ms. Ashmore's opinion about Plaintiff's applying for SSDI; that Ms. Ashmore told Plaintiff that "she could apply if she felt it necessary"; and that when asked if she wanted to return to work, Plaintiff responded, "not for minimum wage." Tr. 269.

Ms. Ashmore reported, on March 17, 2006, that she had researched additional job opportunities for Plaintiff and that a phone call to Plaintiff about these opportunities was not returned. Tr. 269.

Ms. Ashmore reported, on March 29, 2006, that she spoke with Plaintiff and made suggestions "relative to future employment," including para professional, bus monitor, security (desk

monitor), and quality control; that Plaintiff' did not like any of the suggestions made, except for quality control"; that Plaintiff "explained that she had been working in [quality control] at MEMC for approximately 6 months"; that she "thought she would enjoy this type of work and felt capable of handling the physical requirements"; and that Ms. Ashmore would research such jobs in the area and would contact Plaintiff with her findings. Tr. 268.

Dr. Blair reported, on April 5, 2006, that Plaintiff complained of pain in both elbows and numbness in her feet and hands and that neurological examination showed that Plaintiff was normal in regard to mental status, motor, cranial nerves, sensory, and coordination. Tr. 442.

Dr. Blair reported, on April 7, 2006, that Plaintiff had been given a prescription for Lexapro; that Lexapro made Plaintiff thirsty; and that Plaintiff was prescribed Celexa. Tr. 310.

Dr. Blair reported, on May 10, 2006, that Plaintiff requested a new nebulizer. Tr. 310.

Dr. Blair reported, on May 22, 2006, that Plaintiff complained that Tricor cost too much, and that Plaintiff was switched to Niaspan. Tr. 309.

Ms. Ashmore, of MERS Goodwill, reported on May 25, 2006, that Plaintiff's primary disability was a learning disability; that Plaintiff's secondary disability was a mood disorder; that Plaintiff was referred for an assessment of her job readiness; that Plaintiff requested her file be closed and that "she [] decided to apply for SSDI at [that] time and [was] not interested in pursuing employment"; that Plaintiff was "a high school graduate of average intelligence" and had "a valid driver's license and own[ed] a vehicle"; that Plaintiff's last employment was as an HR assistant at Hogan Trucking; that Plaintiff left that position to care for her daughter; that, prior to Hogan, Plaintiff had worked as a part-time customer service representative, a full time quality inspector for MEMC, and a full time data entry clerk for Watlow Electric; that Plaintiff's attendance at MERS Goodwill

counseling sessions was "sporadic"; that Plaintiff "did not appear overly interested in pursuing employment while undergoing evaluation at MERS/Goodwill" and "appeared to lack motivation"; that Plaintiff "had high expectations of her possibilities, while rejecting all suggestions made by [Ms. Ashmore]"; that Plaintiff "scored in the average range of functioning on all assessments"; that Plaintiff communicated clearly and openly during her evaluation; that Plaintiff reported that "her medications make her sleepy, cause[d] dry mouth, nose bleeds, forgetfulness, high blood pressure, and make her hands shake; that it was recommended that Plaintiff's file be closed at her request; and that "after undergoing a lengthy evaluation and researching several possibilities for future employment, it was determined that [Plaintiff] [was] not appropriate for work at [that] time due to the severity of her disabilities." Tr. 260-62.

On May 25, 2006, Ms. Ashmore recommended that Plaintiff apply for disability income "as she [did] not wish to seek employment at [that] time." Tr. 267.

A radiology consultation from Barnes-Jewish St. Peters Hospital, requested by Dr. Blair, dated June 19, 2006, states that Plaintiff required additional imaging evaluation to evaluate "scattered fibroglandular densities" and "asymmetrical density… in the upper outer quadrant" of her right breast. Tr. 324.

A radiology consultation report from Barnes-Jewish St. Peters Hospital, dated July 3, 2006, states that Plaintiff showed "mild architectural distortion in the right upper outer breast without ultrasound or clinical correlation. This may represent fibrocystic change or secondary to blunt trauma," and that "continued clinical follow up" was recommended. Tr. 323.

Pierre Moeser, M.D., F.A.C.P., F.A.C.R., of BJC Medical Group, reported on July 7, 2006, that Plaintiff's medications were Lofibra, Celexa, Nasonex, BuSpar, Pseudovent, Ambien, Albuterol,

Proventil, Advair, and Tramadol; that Plaintiff had asthma, hypertriglyceridemia, and depression; that Plaintiff had no indication of IMID; that Plaintiff may have had "some very minimal DJD of the hands which would not be enough to explain her symptoms"; and that Dr. Moeser recommended additional tests and a review of Plaintiff's past medical records. Tr. 342.

A Patient History Form completed by Plaintiff, dated July 7, 2007, states that she had pain and numbness/tingling in both of her feet and elbows; that her pain was a ten on a one to ten scale; that her pain was "constant"; and that her pain interfered with her normal functions. Tr. 344.

A radiology consultation report, completed by Dr. Moeser, dated July 7, 2006, states that Plaintiff tested negative for osteoarthrosis in both her right and left elbows; that Plaintiff's results suggested a fracture near Plaintiff's ring finger; and that "no further radiographic abnormalities [were] seen." Tr. 346-49.

A July 31, 2006 Psychological Evaluation, completed by Dr. Turner of Psych Care Consultants, states that Plaintiff was well groomed, calm, and cooperative; that she had normal speech; that her mood was depressed and anxious; that she denied thoughts of suicide and delusions; that her thought process was intact; that her memory was fair; that she was oriented in regard to self, time, place and person; that her concentration and judgment were fair; and that, at Axis VI, she had a GAF of 55-60.[3] Tr. 426-28.

_____

[3]      Global Assessment of Functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment.  Id. at 32.

Records from Northland Mid-America Orthopedics, Inc., dated August 15, 2006, state that Plaintiff presented with problems with her elbows; that she had "followed for a disability for this condition"; that Plaintiff reported trouble driving a car and that she cannot type; that "with [her] history," the examiner did not "feel that [Plaintiff] qualifi[ed] for disability without an examination"; and that the examiner "recommended that [Plaintiff] have a functional capacity evaluation to determine her level of tolerance." Tr. 361.

A progress note from Psych Care Consultants, dated August 21, 2006, states that Plaintiff's appearance was average; that her speech was coherent, relevant, and spontaneous; that her mood was euthymic; that mood swings were absent; that her sleep was good; that Plaintiff did not have suicidal or homicidal thoughts; that her anxiety was "free floating"; that she was "oriented x 4"; that she did not have delusions or hallucinations; that her memory and insight were normal; and that she had side effects from medication. Tr. 405.

Progress notes from Psych Care Consultants, dated September 11, October 9 and November 6, 2006, state that Plaintiff's speech was coherent; that her sleep was interrupted; that she did not have suicidal or homicidal thoughts; that her affect was "appropriately reactive"; that her memory and insight were normal; that she was oriented x 4; and that her judgment was good.  In September and October her mood was euthymic and in November it was depressed. Tr. 430-32.

A progress note from BJC Medical Group, dated September 28, 2006, states that Plaintiff had left elbow numbness. Tr. 342.

A Patient Detail Report from St. Joseph Hospital West, completed by J. Lombardo, M.D., dated October 26, 2006, states that Plaintiff was given a protein electophores serum test and that it

showed that "no abnormal peaks present." Tr. 245.

A report from Michele Wood, D.O., of Metropolitan Neurology, dated December 7, 2008, states that Plaintiff had numbness in her arms; that Plaintiff's mental status exam was normal; that Plaintiff ambulated normally; that her motor and sensory exams were normal; that her gait was normal; that she had good radial pulses at rest and over head; and that she had "good radial pulses at rest and over head." Tr. 441.

A radiology report, dated December 14, 2006, states that an MRI of Plaintiff's C-Spine showed mild degenerative disc disease and spondylotic changes and that there was no large disc herniation or canal stenosis. Tr. 443.

A note from St. John's Hospital, dated December 22, 2006, handwritten on the radiology report of December 14, 2006, states, "please tell patient - mild arthritis but nothing." Tr. 443.

Progress notes from BJC Medical Group, dated March 8, 2007, state that Plaintiff had neuropathy already under treatment and mild peripheral DJD of hands, feet, and knees. Tr. 437.

A report from Dr. Wood, of Metropolitan Neurology, dated September 6, 2007, states that the impression was that Plaintiff had fibromyalgia and was to return in three months. Tr. 440.

Akgun Ince, M.D., of Arthritis Consultants, Inc., stated in a letter to Dr. Farley, dated September 16, 2007, that Dr. Ince examined Plaintiff and that Plaintiff's heart had regular rate and rhythm; that Plaintiff had no active synovitis in her joints; that the assessment was fibromyalgia syndrome; and that it was recommended that Plaintiff begin Ultracet and an exercise program. Tr. 446.

### III.

23

## DECISION OF THE ALJ

The ALJ considered that Plaintiff alleged she was disabled due to pain and limitations of function associated with her elbows, feet, asthma, bipolar disorder, depression, migraines, and arthritis. The ALJ found that Plaintiff had the following severe impairments: elbow injury and residuals from left elbow injury, asthma, and residuals from an avulsion fracture of the left ankle. The ALJ further found that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of April 9, 2004, through the date she was last insured, December 31, 2005. After considering the medical evidence, the ALJ determined that Plaintiff's impairments did not meet or equal the criteria in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § § 404.1520(d), 404.1525 and 404.1526). Tr. 15-16.

The ALJ concluded that Plaintiff's mental impairments did not cause more than minimal limitation to her ability to work in that they did not limit her in the four functional areas set out to evaluate mental disorders in section 12.00C of the Listing of Impairments (20 C.F.R., Part 404, Subpart P, Appendix 1). In particular, the ALJ found that Plaintiff was not limited in self-care, mildly limited in social functioning, not limited in concentration, and experienced no episodes of decompensation. Because Plaintiff's mental impairments caused no more than "mild" limitation in any of the categories, the ALJ found that they were not severe. (20 C.F.R. § 404.1520a(d)(1)). Tr. 16.

The ALJ further found that, through the date she was last insured, Plaintiff had the RFC to perform the full range of sedentary work, including her former work as a quality assurance technician. In reaching this conclusion, the ALJ considered Plaintiff's symptoms and the extent to which they could reasonably compliment objective medical observations, as required by 20 C.F.R. § 404.1529

24

and SSRs 96-4p and 96-7p.

The ALJ also found that Plaintiff's past relevant work as a quality assurance technician did not require the performance of work-related activities which her RFC precluded. Accordingly, the ALJ concluded that Plaintiff has not been under a "disability," as defined by the Act, since her alleged onset date of April 9, 2004, through December 31, 2005, the date she was last insured. (20 C.F.R. § 404.1520(f)). Tr. 17-23.

## IV.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)). Third, the ALJ must determine whether the claimant has an

impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. §§ 404.1520(f).

Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug.26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision,

that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. Cox, 495 F.3d at 617; Guillams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject

to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;
>
> (2) The education, background, work history, and age of the claimant;
>
> (3) The medical evidence given by the claimant's treating physicians;
>
> (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
>
> (5) The corroboration by third parties of the claimant's physical impairment;
>
> (6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and
>
> (7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ.& Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically

determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) The claimant's daily activities;

(2) The subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) Any precipitating or aggravating factors;

(4) The dosage, effectiveness, and side effects of any medication; and

(5) The claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Guillams, 393 F.3d at 801; Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart,

361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity ("RFC") is defined as what a claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Karlix v. Barnhart, 457 F.3d 742,746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Goff, 421 F.3d at 794("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Baker v. Barnhart, 457 F.3d

882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

## V.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position. Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff contends that the ALJ failed to comply with 20 C.F.R. § 404.1527 by failing to accord adequate weight to the opinion of her treating physician, Dr. Turner, as stated in his RFC Assessment of Plaintiff; that, contrary to the opinion of the ALJ, the opinion of Plaintiff's treating psychiatrist/psychologist are supported by "psychiatric signs" ; that, contrary to the ALJ's opinion, she did receive treatment for her alleged psychiatric conditions; and that Dr. Turner's opinion is consistent with Ms. Ashmore's notes.

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). The opinions and findings of the plaintiff's treating physician are entitled to "controlling weight" if that opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2) (2000)). Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Cunningham v. Apfel, 222

F.3d 496, 502 (8th Cir. 2000) (citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir.1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)). However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate need to evaluate record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8thCir.1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion). See also Hacker v. Barnhart, 459 F.3d 934, 9937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is giving controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence"). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). A treating physician's checkmarks on a form, however, are conclusory opinions which can be discounted if contradicted by other objective medical evidence. Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); Hogan 239 F.3d at 961; Social Security Ruling 96-2p, (July 2, 1996). Where diagnoses

of treating doctors are not supported by medically acceptable clinical and laboratory diagnostic techniques, the court need not accord such diagnoses great weight. Veal v. Bowen, 833 F.2d 693, 699 (7th Cir. 1987).  An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch, 201 F.3d at 1013. See also Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that an ALJ may give a treating doctor's opinion limited weight if it is inconsistent with the record).  "Medical reports of a treating physician are ordinarily entitled to greater weight than the opinion of a consulting physician." Chamberlin, 47 F.3d at 1494 (citing Matthews, 879 F.2d at 424). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as whole." Hogan, 239 F.3d at 961.

A treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Moreover, a brief, conclusory letter from a treating physician stating that the applicant is disabled is not binding on the Secretary. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir.1986) (per curiam) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature."). See also Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight should not be given to the RFC assessment); Chamberlain, 47 F.3d at 1494; Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir.1994) (citing Thomas

v. Sullivan, 928 F.2d 255, 259 (8th Cir.1991)); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, diagnostic evidence). On the other hand, a treating physician's observations should not necessarily be treated as conclusory where the doctor had "numerous examinations and hospital visits" with a claimant. See Turpin v. Bowen, 813 F.2d 165, 171 (8th Cir.1987).

Additionally, Social Security Regulation ("SSR") 96-2p states, in its "Explanation of Terms," that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, *2 (S.S.A. July 2, 1996). Additionally, SSR 96-2p clarifies that 20 C.F.R. § § 404.1527 and 416.927 require that the ALJ provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." Id. at *5.

When considering the weight to be given the opinion of a treating doctor, the entire record must be evaluated as a whole. Wilson v. Apfel, 172 F.3d 539, 542 (8th Cir. 1999) (quoting Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996) ("Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole.").

"Generally, the longer a treating source has treated [a claimant] and the more times [the claimant has] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion." 20 C.F.R. §§ 404.1527(d)(2)(i) & 416.927(d)(2)(i). See also Randolph

34

v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) (holding that a doctor's opinion stated in a checklist should not have been given controlling weight because the doctor had met with the plaintiff only three times at the time he completed the form).  See also Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (holding that the ALJ was entitled to give less weight to the opinion of a treating doctor where the doctor's opinion was based largely on the plaintiff's subjective complaints rather than on objective medical evidence) (citing  Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005)).

As stated above, the record includes an undated Mental RFC Assessment which Plaintiff states was completed by Dr. Turner.  This Mental RFC Assessment states that it addresses Plaintiff's condition "as of December 2005," the date by which she must establish that she became disabled.  Upon determining that controlling weight should not be given to Dr. Turner's Mental RFC Assessment of Plaintiff, the ALJ evaluated the record as a whole. See Wilson, 172 F.3d at 542.  Additionally, the ALJ set forth his reasons for not giving Dr. Turner's opinion controlling weight. See King, 742 F.2d at 973.  First, consistent with the case law and Regulations, upon determining that Dr. Turner's RFC Assessment should not be given controlling weight, the ALJ considered that it lacked objective medical evidentiary support.  Indeed, the RFC Assessment itself states that tests were not administered. See SSR 96-2p at *5; 20 C.F.R. § § 404.1527 and 416.927; Veal, 833 F.2d at 699.  The record does not reflect that Dr. Turner's opinion as stated in the RFC Assessment was based on any medical data. See Leckenby, 487 F.3d at 632.  Moreover, Dr. Turner's checkmarks on the undated RFC Assessment are not entitled to controlling weight because they are not supported by medical data. See Stormo, 377 F.3d at 805-06; Hogan 239 F.3d at 961; Social Security Ruling 96-2p.

Second, consistent with the case law and Regulations, the ALJ discounted Dr. Turner's RFC

Assessment because it was based on Plaintiff's subjective complaints. See Kirby, 500 F.3d at 709.

Third, consistent with the case law and Regulations, upon not giving Dr. Turner's RFC Assessment controlling weight, the ALJ considered that Plaintiff had not sought mental health treatment during the relevant period. See Randolph, 386 F.3d at 840. Indeed, the earliest treatment record from Dr. Turner in the record is dated July 31, 2006. As such, the record does not reflect how Dr. Turner could have assessed Plaintiff's mental status as of December 2005.

Further, Dr. Turner's July 31, 2006 notes state that Plaintiff was calm, cooperative, fully oriented and had normal speech and fair memory and concentration. Dr. Turner also reported in July 2006 that Plaintiff denied thoughts of suicide and delusions; and that her thought process was intact. In September, October, and November 2006, Dr. Tuner reported that Plaintiff's speech was coherent; that she had no suicidal thoughts; that she was oriented in all respects; that her memory and insight were normal; and that her judgment was good. In November 2006, Dr. Turner reported that her affect was appropriately reactive. In September and October 2006, Dr. Turner reported that Plaintiff's mood was euthymic, which is described as a "state of mental tranquility and well being; neither depressed nor manic" Dorland's Illustrated Med. Dictionary 629 (29th ed. 2009). As such, Dr. Turner's findings in his RFC Assessment are not supported by and are inconsistent with his own records. See Hacker, 459 F.3d at 937; Cox, 471 F.3d at 907; Prosch, 201 F.3d at 1013. Under such circumstances, the ALJ properly found that Dr. Turner's opinion is not controlling.

Additionally, upon finding Plaintiff not disabled, the ALJ considered that Plaintiff was not credible and that her assertion of being unable to work was inconsistent with what she told Ms. Ashmore, a vocational counselor. Plaintiff told Ms. Ashmore on March 9, 2006, that she felt she could return to work; she told Ms. Ashmore on March 14, 2006, that she did not want to work for

minimum wage; and she told Ms. Ashmore on March 29, 2009, that she thought she would enjoy working in quality control and felt that she was capable of handling the physical requirements of such a job.  Plaintiff's statements to Ms. Ashmore are inconsistent with Plaintiff's assertion that, as of December 31, 2005, she was disabled.  Significantly, Ms. Ashmore closed Plaintiff's case in May 2006 because Plaintiff did not "wish to seek employment." Tr. 267. See Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996) (holding that the ALJ properly discounted the Plaintiff's allegation that he was disabled where he stated that he could "go out and find a minimum wage job at any time").   To the extent Plaintiff told Ms. Ashmore that she did not want to work, the Eighth Circuit has held that an ALJ may discount a claimant's subjective complaints for, among other reasons, that he appeared to be motivated to qualify for disability benefits. Eichelberger, 390 F.3d at 590 (holding that although the ALJ found that the claimant had objectively determinable impairments, the ALJ properly considered that the claimant's incentive to work might be inhibited by her long-term disability check of $1,700 per month); Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir.1996) (holding that the ALJ to judge properly considered a strong element of secondary gain upon discrediting the claimant). Despite Plaintiff's assertions to the contrary, Ms. Ashmore's notes are consistent with the findings of the ALJ.

The court notes that Dr. Turner's findings in the undated RFC Assessment are inconsistent with records of Ms. Spencer who reported, in 1994, that Plaintiff had an IQ of 95, which placed her within the range of average intellectual functioning, and that she had a GAF of 61, which put Plaintiff in the range of mild limitations.  Likewise, in his Mental RFC Assessment and on July 31, 2006, Dr. Turner assigned Plaintiff a GAF which placed her in the mild range, which is inconsistent with a finding that Plaintiff is disabled within the meaning of the Act.  Also, it was determined, pursuant to

a May 1998 psychiatric evaluation, that Plaintiff was alert and had intact memory, good insight and judgment.

In regard to Plaintiff's assertion that the ALJ erred in finding that she did not receive treatment for her allege mental conditions, the record does not reflect that Plaintiff received such treatment other than from Dr. Turner, commencing July 2006, which is after the date upon which Plaintiff's insured status expired. See Basinger v. Heckler, 725 F.2d 1166 (8th Cir. 1984) (holding that a claimant has the burden of establishing the existence of a disability on or before the date that her insured status expired). To the extent that, prior to December 31, 2005, various medical doctors referenced Plaintiff's history of depression, ADD, or ADHD, the record does not reflect that Plaintiff received treatment for these conditions prior to that date or that any reference to these conditions was anything other than self-reporting.

The court finds, therefore, that the ALJ gave proper weight to Dr. Turner's undated RFC Assessment of Plaintiff; that the findings reported by Dr. Turner in his RFC Assessment are not supported by Plaintiff's records, by Dr. Turner's own records, or by the records of other sources; that the ALJ did not err in finding that Plaintiff did not receive treatment for her alleged psychiatric conditions; and that the ALJ's decision is consistent with Ms. Ashmore's notes; and that the ALJ's decision is supported by substantial evidence on the record as a whole.

## VI.
## CONCLUSION

The Court finds that the Commissioner's decision is supported by substantial evidence contained in the record as a whole and should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief sought by Plaintiff in her Complaint and Brief in Support of Complaint be **DENIED**; Docs. 1, 7.

The parties are advised that they have eleven (11) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of October, 2009.